IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| HEMASUDHA CHATRAGADDA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Civil Action No. 15-1051 |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| DUQUESNE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM ORDER**

**I.     MEMORANDUM**

For the reasons that follow, Defendant's Motion for Summary Judgment (Doc. 42) will be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**[1]

Hemasudha Chatragadda ("Ms. Chatragadda" or "Plaintiff") initiated this lawsuit on August 10, 2015, alleging that Defendant Duquesne University ("Defendant," "Duquesne" or "the University") removed her from, and denied her application for readmission to, the Department of Chemistry and Biochemistry's (the "Department") Ph.D. program in violation of Title IX of the Education Amendments Act of 1972 ("Title IX") and Title VI of the Civil Rights Act of 1964 ("Title VI"). See generally Compl. (Doc. 1). Specifically, Plaintiff alleges she was removed from, and denied readmission to, the Ph.D. program because she filed a criminal

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

1

complaint against her former romantic partner, also a Ph.D. student in the Department, alleging among other things, sexual assault. Id. In her Complaint, Plaintiff also alleges intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract. Id.

Plaintiff began pursuing her Ph.D. at Duquesne in the Fall of 2010. Def.'s Stmt. of Facts (Doc. 44) at ¶ 7. One of the reasons Plaintiff chose to attend Duquesne was because her then-partner, Kaylan Immadisetty ("Mr. Immadisetty"), also was pursuing his Ph.D. within the same Department. (Doc. 44) at ¶ 5; (Doc. 48) at ¶ 5. Plaintiff's relationship with Mr. Immadisetty, which lasted from approximately 2007 until 2011, could appropriately be described as abusive. (Doc. 44) at ¶ 76; (Doc. 48) at ¶ 76. According to Plaintiff, Mr. Immadisetty sexually and emotionally abused her during their relationship, including two forced abortions, and continued to harass and emotionally abuse her after their relationship. (Doc. 48) at ¶¶ 14, 27, 76, 80. After an encounter in 2011, in which Mr. Immadisetty forcefully took from Plaintiff a Duquesne issued laptop, Plaintiff finally came forward to her advisor, Dr. Kingston, about the theft and ultimately the abuse. (Doc. 44) at ¶¶ 77-79; (Doc. 48) at ¶¶ 77-79. On January 27, 2012, Dr. Kingston successfully encouraged Plaintiff to file a report with the Duquesne Police. (Doc. 44) at ¶ 78; (Doc. 48) at ¶ 78. However, Mr. Immadisetty's abuse did not end. Mr. Immadisetty continued to pressure Plaintiff, even threatening to commit suicide if she did not recant her statements. Doc. 48 at ¶ 80.

On January 31, 2012, Plaintiff ultimately withdrew her allegations of sexual and emotional abuse, leaving in place only the accusation of theft. (Doc. 44) at ¶ 84. Duquesne attempted to determine whether Plaintiff withdrew her allegations voluntarily. Id. at ¶ 85. She confirmed to Dr. Madura, a professor in the Department and Mr. Immadisetty's advisor, the

University's Title IX Coordinator, Cheryl Knoch, and the Director of the Office of Student Conduct, Susan Monahan, that she was not coerced or threatened into telling the Duquesne Police that she had lied about the abuse allegations. Id. at ¶ 85. Plaintiff now maintains Mr. Immadisetty coerced her into recanting and lying about whether she withdrew her statement voluntarily. (Doc. 48) at ¶ 85. In response to Plaintiff's initial complaint, Duquesne Police directed Plaintiff not to have any contact with Mr. Immadisetty, (Doc. 44) at ¶ 80, had Plaintiff meet with their Title IX Coordinator and the Director of the Office of Student Conduct, id. at ¶ 85, and held a University Conduct Hearing evaluating Mr. Immadisetty's conduct. Id. at ¶ 92. During the hearing, Mr. Immadisetty accepted responsibility for the theft, for harassing Plaintiff, and for failing to comply with the University Police's directive not to contact Plaintiff. Id. at 92. Duquesne placed Mr. Immadisetty on disciplinary probation for the remainder of his time at Duquesne. Id.

Plaintiff's allegations center around her reporting of Mr. Immadisetty and her subsequent treatment within the Department. Students in the Department's Ph.D. program are required to meet a number of academic requirements, including but not limited to, preparing and defending a Research Experience I, a Research Experience II and an Original Research Proposal ("ORP"). Id. at 8; Pl.'s Stmt. of Facts (Doc. 48) at ¶ 8. On December 19, 2010 and April 18, 2011, respectively, Plaintiff successfully passed her Research Experience I and Research Experience II defense. (Doc. 44) at ¶¶ 13, 23. In December of 2011, she passed the defense of her Dissertation Outline, a necessary prerequisite to her ORP. (Doc 44) at ¶ 37. While at each step, Plaintiff was permitted to continue to pursue her education, and the various reviewing committees informed her of areas in which she would need to improve if she intended to complete her degree successfully. See generally (Doc. 44) at ¶¶ 13-14, 22-27; (Doc. 45-1) at 26-

27; (Doc. 48) at ¶¶ 14, 24, 28.  These areas for improvement included, but were not limited to, reducing grammar and typographical errors in her written work-product, strengthening her oral responses to questions and eliminating errors in her data tables.  Id. at ¶ 14; (Doc. 48) at ¶ 14; (Doc 45-1) at 26.  She was also instructed to improve her research techniques, her understanding of various chemistry concepts, and her oral presentation skills.  (Doc. 44) at ¶¶ 22-27.

The next step in Plaintiff's Ph.D. process was her ORP defense.  (Doc. 44) at ¶ 40.  Dr. Wheeler, the Department Chair, appointed Plaintiff's ORP Committee, prior to the Fall 2012 semester.  Id. ¶ 47.  Professor Jeffrey Madura, Professor Bruce Beaver and Professor Ralph Wheeler constituted the voting members of Plaintiff's ORP Committee.  Id. at ¶ 48.  On December 7, 2012, Plaintiff received an incomplete for her ORP exam.  Id. at ¶ 52.  The ORP Committee gave Plaintiff a second opportunity to present and defend her ORP.  Id. at ¶ 53. By letter, Plaintiff's ORP Committee provided her with a number of specific deficiencies from her first exam that she should work to improve for her second exam.  ORP Comm.'s Dec. 14, 2012 Letter (Doc. 45-1) at 33.  These areas were similar to, if not the same as, areas upon which her prior reviewing committees instructed her to improve if she hoped to continue with her studies.  Compare id., with (Doc. 44) at ¶¶ 13-14; 22-27; (Doc. 45-1) at 26-27; (Doc. 48) at ¶¶ 14, 24, 28.  Specifically, the Committee informed Plaintiff that her "presentation was at times difficult to follow;" that her "responses to some questions indicted [sic] a significant lack of understanding of basic chemistry;" and that the reader of her proposal "is distracted by numerous typos, spelling errors, redundant text, missing and inappropriate references, and inconsistent formatting." (Doc. 45-1) at 33.  The Committee encouraged her, stating that it "believes that given the [second] opportunity, [she] can demonstrate [the] level of knowledge and critical thinking skills of a Ph.D. scientist." Id.  Plaintiff took her second ORP exam on February 1,

4

2013. (Doc. 44) at ¶ 57. Plaintiff learned on that same day that she did not pass her second ORP exam. Id. at ¶ 60. The Committee felt, that although she had made some improvements, she still demonstrated a "lack of understanding of basic chemical principals" and that her "slides still contained typos that [she] was explicitly told to correct." ORP Comm.'s February 7, 2013 Letter (Doc. 45-1) at 39. At that time, she was placed on "Master's Track only," which, according to Duquesne, means she needed to complete a Master's thesis before she could reapply to the Ph.D. program. Id. Plaintiff was provided an additional condition of needing to score a 100 on the TOEFL exam before she could reapply. Id. at ¶ 95. Plaintiff disputes that she was provided with these prerequisites in a timely manner, asserting she only learned of these conditions when she learned that another student was provided with a third opportunity to take the ORP exam, without having to complete his Master's thesis. (Doc. 48) at ¶ 60.

    Seven students, including Plaintiff, took the ORP exam in December 2012. (Doc. 44) at ¶ 73. Of those seven, two passed and the remaining five received incompletes and were given a second chance to take the exam. Id. Of the five candidates to take the exam a second time, three passed. Id. at ¶ 74. Plaintiff and one other student, J.T, a white male, were both placed on the Master's track. Id. According to Defendant, J.T. was given an opportunity to reapply without first completing a Master's thesis because he "demonstrated a much stronger understanding of the fundamental principles and concepts" than Plaintiff. However, the letter the ORP Committee provided to J.T. following his second failure reads somewhat similarly to the letter it provided to Plaintiff.[2] J.T. ORP Comm. Feb. 7, 2013 Letter (Doc 45-1) at 111. J.T.'s responses to questions also "indicted [sic] a lack of understanding of basic chemical principles." Id. In Fall 2013,

---

[2] It is worth noting that the ORP Committee's letters all read similarly. See (Doc. 49-13) (various ORP Committee letters congratulating some candidates and informing others that they did not pass). Indeed, many letters indicate that the candidate needs to strengthen their "lack of understanding about the fundamentals." Id.

5

before completing her Master's thesis, Plaintiff applied for and was denied readmission to the Ph.D. program. (Doc. 44) at ¶ 94.

Plaintiff alleges that she was removed from, and was not readmitted to, the Ph.D. program not because of her academic performance, but for having reported Mr. Immadisetty to the police; that the faculty, loyal to Mr. Immadisetty and not to her, took this opportunity to remove her from the program. Plaintiff asserts that she was "shunned" by the entire Department as a result of the allegations she levied against Mr. Immadisetty. (Doc. 48) at ¶ 89.

## **ANALYSIS**

As a preliminary matter, Defendant argues that Plaintiff's claims are barred by the applicable statutes of limitation. (Doc. 43) at 8-9. In support of this argument, Defendant points to the date Plaintiff learned she was removed from the Ph.D. program, February 7, 2013, being more than two years prior to the filing of the Complaint, August 10, 2015. Id. at 9. Plaintiff responds by arguing that she has been subjected to continuing harm, and that Duquesne's decision to remove her from the Ph.D. program was but one in a series of events where Plaintiff was subject to unlawful discrimination, retaliation and harassment on the basis of her sex, race or national origin. (Doc. 50) at 3-6. She alleges that each instance in which she unsuccessfully attempts to regain access to the Ph.D. program constitutes another instance of redressable harm. Id.

The Court agrees that the harm alleged by Plaintiff is not limited to her removal from the Ph.D. program on February 7, 2013, but that it includes the Department's denial of her readmission to the program. "[W]hen a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that

6

would otherwise be time barred." Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1295 (3d Cir. 1991) (citing Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1129 (3d Cir.1988)). Plaintiff attempted readmission to the Ph.D. program in the Fall of 2013. (Doc. 44) at ¶ 94. Plaintiff learned on October 11, 2013, that the Department denied her request for readmission. Id. at ¶ 95. The Department denied her readmission less than two years prior to her filing the instant action. Accordingly, Plaintiff's claims are not barred by any statute of limitations.

Defendant next argues that Plaintiff has failed to point to sufficient facts in the record to support her Title IX (Count I) and Title VI (Count II) claims. Plaintiff's Title IX and Title VI claims are analyzed under the McDonnell Douglas burden-shifting framework. Meyers v. California Univ. of Pa., 2014 WL 3890357, at *12 (W.D. Pa. July 31, 2014). Defendant assumes for purposes of its motion that Plaintiff can establish a *prima facie* case of discrimination; she is a member of a protected class, she suffered an adverse action and the adverse action could give the inference of intentional discrimination. (Doc. 43) at 10; Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). Thus, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for the adverse action. Fuentes, 32 F.3d at 764.

Defendant offers as its legitimate non-discriminatory reason that, Plaintiff was removed because, "in the ORP Committee's professional judgment, she failed to meet the established academic standards for continuing in the Ph.D. program." (Doc. 43) at 10. As to the decision to deny Plaintiff's application for readmission, Duquesne contends she was denied readmission because she failed to meet the prerequisites the Department established in order for her to renter

the program, namely that "she failed to complete a Master's thesis and failed to provide proof that she achieved the requisite TOEFL score." Id.

The burden thus returns to Plaintiff to discredit Defendant's proffered legitimate non-discriminatory reason. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d. Cir. 1999). In order to do this, Plaintiff must put forth sufficient evidence such that a reasonable factfinder could "(1) disbelieve [Duquesne's] articulated legitimate reason; *or* (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of Duquesne's action." Id. at 764 (emphasis added). She can accomplish this by demonstrating:

> such weaknesses, implausibility's, inconsistencies, incoherencies, or contradictions" in the [institution's] proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them 'unworthy of credence' and hence infer that the [institution] did not act for the asserted non-discriminatory reason.

Fuentes, 32 F.3d at 766 (internal citations omitted).

Defendant additionally argues that Plaintiff has failed to establish that the University engaged in any retaliatory conduct in violation of Title IX or Title VI. To demonstrate a *prima facie* claim for retaliation under Title IX or Title VI, a plaintiff must prove that: (1) she engaged in protected activity; (2) the University subjected her to an adverse action after or contemporaneously with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. See Yan v. Penn State Univ., 529 Fed. Appx. 167, 171 (3d Cir. 2013) (citation omitted); Whitfield v. Notre Dame Middle Sch., 412 Fed Appx. 517, 522 (3d Cir. 2011). Defendant challenges all three prongs of the *prima facie* case and argues that even if Plaintiff can establish a prima facie case of retaliation, she cannot point to any evidence upon which a reasonable juror could conclude that Defendant's legitimate non-retaliatory reason was pretext and that retaliatory animus was the actual motivating factor. (Doc. 43) at 14-18.

The Court finds that a reasonable juror could conclude that Defendant's proffered reason for Plaintiff's removal from the Ph.D. program and denial of readmission thereto – that it was based solely on Plaintiff's poor academic performance – is pretextual and that discriminatory or retaliatory animus was the actual motivating factor. While it certainly is true that there is evidence that Plaintiff failed to meet certain of Defendant's academic requirements, the record is clear that another similarly-situated student, outside Plaintiff's protected classes, also failed to meet these academic requirements for seemingly similar, if not identical, reasons and was treated more favorably. Defendant struggles mightily to establish meaningful academic differences between the two students. Defendant points to the deposition testimony of Drs. Madura and Wheeler, and the denial and promotion letters the Department sent to J.T. and Plaintiff. However, the formulaic nature of the letters, coupled with the fact that both the letters and the depositions post-date Plaintiff's protected activity, give rise to a genuine issue of material fact concerning Defendant's proffered nondiscriminatory/nonretaliatory reasons. The Court agrees with Plaintiff that J.T. is a valid comparator and that a reasonable juror could conclude both that he received more favorable treatment than Plaintiff and that the disparate treatment is evidence of discrimination, retaliation and/or harassment.

Plaintiff's remaining claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract all arise under state law. Defendant moves for summary judgment on each state law claim. Under Pennsylvania law, in order to establish a claim for intentional infliction of emotional distress, a plaintiff must *inter alia* establish severe emotional distress. Hoy v. Angelone, 691 A.2d 476, 482 (Pa. Super. Ct. 1997), aff'd 720 A.2d 745 (Pa. 1998). "Existence of the alleged emotional distress must be supported by competent medical evidence." Kazatsky v. King David Memorial Park, Inc., 527 A.2d 988, 995 (Pa. 1987). For negligent infliction of emotional distress, a plaintiff must show that as a result of defendant's

9

negligence she suffered emotional distress which manifested in a physical injury. Armstrong v. Paoli Memorial Hosp., 633 A.2d 605, 609 (Pa. Super. Ct. 1993). Plaintiff has provided no medical evidence that she suffered any harm as a result of Duquesne's conduct. Without any medical evidence upon which to rely, the Court is unable to find that Plaintiff has suffered from emotional or physical distress. Accordingly, Defendant's motion with respect to those counts will be granted.

Plaintiff's breach of contract claim is based on a number of instances where Plaintiff alleges Defendant did not adhere to its written guidelines, policies and procedures. Swartley v. Hoffner, 734 A.2d 915, 919 (Pa. Super. Ct. 1999) ("The contract between a private institution and a student is comprised of the written guidelines, policies, and procedures as contained in the written materials distributed to the student over the course of their enrollment in the institution.") Specifically, Plaintiff argues (1) Defendant's removal of Plaintiff from the Ph.D. program for discriminatory or retaliatory reasons; (2) Defendant's failure to provide Plaintiff with a safe and comfortable learning environment; (3) Defendant's failure to provide Plaintiff with her stipend; and (4) Defendant's failure to provide Plaintiff with the tools and supplies she needs to complete her work all violate Defendant's written guidelines, policies or procedures in some way. (Doc. 50) at 22. After a thorough review of the record, the Court finds that there exists genuine issues of material fact as to whether the contract between Plaintiff and the University was breached, rendering summary judgment inappropriate.

## II. ORDER

Consistent with the foregoing, Defendant's Motion for Summary Judgment (**Doc. 42**) is **DENIED** as to Plaintiff's Title IX, Title VI and breach of contract claims (Counts I, II and V) and **GRANTED** in all other respects.

July 7, 2016                                s\Cathy Bissoon
                                                                       Cathy Bissoon
                                                                       United States District Judge

cc (via ECF email notification):

All Counsel of Record